**JUDY MORRELL**
**1391 NW ST. LUCIE BLVD WEST #195**
**PORT ST. LUCIE, FL 34986**
**(251) 233-8213**

ORIGINAL

## IN AND FOR THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

**JUDY MORRELL, and**
**BERTHA ZAMORA,**
  **Plaintiffs,**

Civil Case No. 09-753-
KD-C

     **V.**

**THOMAS DAVID LUNCEFORD**
**Also known as TOMMY LUNCEFORD,**
**and JUDITH S. KELLY, also known**
**as JUDITH SAUCIER and JUDY HAMBY,**
**and  JOHN DOES 1-3,**
  **Defendants.**

**TORTUOUS INTERFERENCE,**
**ARSON, FRAUD,  and**
**ATTEMPTED MURDER**

_____/

### NOW COMES PLAINTIFFS, JUDY MORRELL and BERTHA

**ZAMORA,** acting as their own counsel, hereby present to this Honorable Court for

consideration, Pro se, the following action alleging damages by Defendants, individually

and jointly, for action on the grounds of Tortuous Interference, Aggravated Arson, Fraud

and Attempted Murder. The alleged damages were the direct result of the Following

Defendant's actions:

1.

(1) Fraudulent complaints filed with various departments of the city of Gulf Shores, Alabama;

(2) Improper and fraudulent allegations to the local Alcohol Beverage Contral Agency resulting in the agency's refusal to renew the Plaintiff's beer, wine and liquor License;

(3) Failure to pay the Defendant's previous utility bill prior to Plaintiff's occupancy despite promise to do so, resulting in the utility company demanding an additional $10,000.00 fee from Plaintiff's or loss of utility hookup;

(4) Failure to replace missing restaurant equipment or reimburse Plaintiffs for the replacement or repair in the amount of $70,000.00, as promised;

(5) Threatening Plaintiffs and their employees in an attempt to unlawfully remove Plaintiffs from the property; and,

(6) Conspiring to proceed with a plan of intimidatation based upon greed, malicious and felonious actions cuminating with the act of arson that completely destroyed Plaintiff's business, killed Plaintiff's family pet and came within five minutes of killing Plaintiff Morrell and her husband, who were temporarily living on the second level of the property.

The property involved in this action is commonly described as 3401 Gulf Shores Parkway, Gulf Shores, AL 36542 and was being operated at the time as "Nick's At Gulf Shores".

2

## PARTIES

**PLAINTIFFS**:  Plaintiff, Judy Morrell, is an individual, who at the time of the alleged actions by Defendants was living in the City of Gulf Shores, County of Baldwin, State of Alabama, and is now living in Port St. Lucie, Florida.   Plaintiff, Bertha Zamora, is an individual, who did reside at the time of the alleged acts by Defendants  and continues to live in the County of Contra Costa, California.

Plaintiffs can both be served at 1391 NW St. Lucie Blvd West #195 Port St. Lucie, Florida 34986.

**DEFENDANTS:**   Defendant Tommy Lunceford, also known Thomas David Lunceford, is an individual who, at the time of the alleged actions was living with Defendant , Judith S. Kelly, previously known as Judy Saucier at 701 St. Andrews, Gulf Shores, Alabama 36542.  Defendant Kelly can be served at 701 St. Andrews, Gulf Shores, AL 36542.  Defendant Lunceford is presently an inmate at the Mobile County Metro Jail, Booking No.200900005153 and can be served at the facility, 510 South Royal St.  Mobile, AL 36603.

## JURISDICTION

This Court has rightful jurisdiction to this case because:

(a) All allegations of wrongdoing by Defendants, each and all of them, occurred in the County of Baldwin, State of Alabama;

(b) 28 U.S.C. section 1332(a) (1) in that there is a complete diversity of citizenship, the amount of controversy exceeds the sum of $75,000.00 exclusive of interests and costs and personal jurisdiction exists as each Defendant was doing business in the State of Alabama as related to the causes of action in this Complaint.

## **BACKGROUND**

(1)      Plaintiffs met Defendant Lunceford after responding to an advertisement of a Restaurant for lease or sale on or about May 1, 2007.  Defendant Lunceford met Plaintiffs at the now empty restaurant, provided a tour of the facilities, without benefit of utilities, but assured Plaintiffs that all equipment was in working order or would be, provided a list of all equipment and fixtures labeled Exhibit "A" and a plot plan of the property.

(2)      Plaintiff notified Defendant Lunceford that at the time the facility might be too for them based upon their age and financial ability.

(3)      Shortly thereafter, Plaintiff Morrell's husband, who was to initially act as General Manager during the first 6 months of operation was required to be hospitalized with back surgery  cancelling any thought of proceeding with a lease.  Defendant Lunceford then informed Plaintiffs that he had decided to lease the restaurant to a third party, a Mr. Tran. During this time Plaintiffs had not met or even spoken to Defendant Kelly and all negotiations were conducted by Defendant Lunceford .  The only two times Plaintiffs met Defendant Kelly were (a) just before initiation of the lease for approximately 30 minutes at their St. Andrews residence and (b) at the restaurant when the Defendants agreed to purchase a new POS system.  Despite this she became the conspiracy leader in regards to threats and communications with Plaintiffs during the following months.

(4)      Defendant Lunceford continued to contact Plaintiffs during late May and

and early June 2007, stating he was not happy with the present tenant, Mr. Tran,

expected to evict him at any time, and informed Plaintiffs that the restaurant

would be available for lease and occupancy on or before  July 1, 2007.  This was

important as Plaintiffs expected to take advantage of the "tourist season", which

ended on September 1st.

(5)  On or about June 26th Defendant Lunceford forwarded a lease to Plaintiffs

promising occupancy on July 1st if Plaintiffs would "loan" Defendant

"$11,000.00 to make a mortgage payment on the restaurant that was in arrears".

(6)  Plaintiffs loaned Defendants $11,000.00 by sending a cashier Check made

payable to Kelly Lunceford Properties, Inc. (KLP) via U.S. Mail in that amount;

drawn on Wachovia Bank in Georgia.  Said check was deposited and cashed at an

Alabama bank by Defendants.

(7)  Defendants, despite promises, were unable to provide Plaintiffs occupancy to the

restaurant by July1, 2007, however, to induce Plaintiffs to continue their interest

in leasing the restaurant, Defendant Lunceford agreed to the following conditions:

(a) rent was to be $14,000.00 per month, (b) there was to be no lease payment for

September, and (c) Defendants would allow their $3,000.00 deposits in both

utility companies, EMC and Riviera Utilities, to remain, thereby relieving Plaintiff's of responsibility of depositing any security deposits with the utility companies. **Defendant falsely restated that he had gross revenues of $4,000,000.00 yearly and "had made lots of money" while operating the restaurant.** Plaintiffs accepted all of these statements to be true information using it as a basis for agreement to proceed with the lease. Later discovery of Defendant's revenue records showed this figure to be highly inflated, false and provided to Plaintiff by Defendant Lunceford maliciously and solely to entice Plaintiffs to lease and occupy the property.

Defendant Lunceford had full knowledge that revenue from any restaurant operation operating out of this building could not possibly be profitable except under belief of the false revenue figures he provided..

(8) As a requirement for the negotiated conditions, Defendant Lunceford requested that Plaintiffs loan or advance another $11,000.00 to Defendants. Defendant Lunceford assured Plaintiffs that both $11,000.00 loans from Plaintiffs would be used to clear existing arrearages to Vision Bank, the first lien-holder on the property. Discovery later showed that the funds were not used to pay for

arrearages, resulting in Defendant's approximately $43,000.00 arrearages and threatened foreclosure proceedings by Vision bank at the time of the fire.

(9) A Letter of Agreement was executed by both parties on July 19, 2007 outlining credit of the advanced $22,000.00. It clearly stated that $14,000.00 was to credited as August rent payment, with no September payment due, $1,000.00 to be credited to insurance with Plaintiffs to be named as additional insured to the existing policy, and $7,000.00 to be credited as a portion of the required security deposit. At this time Mr. Tran was still occupying the building therefore, Plaintiffs had still not obtained occupancy.

(10)     Plaintiffs were finally provided occupancy of the restaurant, on or about July 25, 2007. On inspection of the property and equipment in the presence of Defendant Lunceford, Plaintiffs discovered that approximately 50% of the equipment listed on Exhibit A, Equipment List was missing and 30% was non-operable; only 20% of the equipment was available for use. There was not enough equipment to operate the restaurant.

(11)     After Plaintiffs complained about the missing and broken equipment Defendant Lunceford stated: "do not worry you will be getting all new equipment

since the previous tenant has stolen what was here when you previously inspected the restaurant and we will be getting a large insurance check in one or two weeks and all will be replaced.  We have already submitted the insurance claim."

(12)        Based upon Defendant Lunceford's  assurances, Plaintiffs began cleaning, renovating and decorating the restaurant.

(13)        On or about August 5, 2007, after several requests by Plaintiffs to Defendant Lunceford to begin replacement of equipment and reimbursement of extraordinary repairs, Defendant Lunceford instructed Plaintiffs to contact restaurant supply house, Mobile Fixtures to purchase necessary small equipment items that were missing from the Exhibit A list and charge to his account.  On delivery of the purchased items Plaintiffs were presented with a bill and informed Defendant's charge account was on COD status and no charges would  be honored.  Plaintiffs contacted Defendant Lunceford regarding reimbursement. His response was again: "**I will pay you as soon as I get my insurance check, and that should be any day now**".  That was the same response Plaintiffs received on each and every request made for promised reimbursements to Defendant Lunceford.

(14)        On or about August 18th, Plaintiffs had completed cleaning, decorating and renovation of the restaurant, in addition to having hired a full staff in anticipation of opening for business.  On attempting to use the Point Of Sale (POS) system that was included on Exhibit A list Plaintiffs discovered that the system was inoperable.  Opening had to be postponed despite Plaintiffs having already hired a full staff and had the responsibility for several thousand dollars of payroll.

(15)        Plaintiffs contacted Defendant Lunceford and asked for an immediate meeting with both Defendants Kelly and Lunceford.  At the meeting Defendants agreed to purchase a new POS system.  Plaintiffs had already researched pricing on a new system and it was mutually agreed that Defendants would purchase a new system from Pinnacle Communications located in Pensacola, Florida.  Since Defendants did not have the funds to purchase the system outright, Pinnacle agreed to finance the purchase with a $2,000.00 deposit from Defendants. Defendant Lunceford agreed to meet the Pinnacle representative the next day with the $2,000.00 deposit.  Defendant Lunceford not only did not provide the $2,000.00 deposit the next day but, even after several requests for payment by

Pinnacle's representative, , Defendant Lunceford failed to pay anything.

(16)     After two weeks Defendant Lunceford finally provided his credit

information to Pinnacle but was denied credit to purchase the system.  After two

weeks of wasted time, another false promise to pay by Defendant Lunceford, and

more lost revenue, Plaintiffs provided the $2,000.00 and qualified for the loan to

purchase the new system.  Defendants never reimbursed Plaintiffs for the system

purchase in the amount of $17,000.00 despite promising to do so on several

occasions.

(17)     Due to Defendants continued false promises to reimburse Plaintiffs

approximately $45,000.00 for purchases of equipment and extraordinary repairs

and continued break-down of existing equipment  Plaintiffs were not able to open

for business during the "tourist season" as originally anticipated, resulting in the

loss of thousands of dollars in revenue.

(18)     Based upon Defendants failure to honor their committed promises,

Plaintiff became suspicious that they were not covered by insurance.   Plaintiffs

contacted the insurance carrier to verify that they had been added to the policy as

"additional Insured", as promised by Defendants.   On or about August 10, 2007,

a copy of the policy was forwarded to Plaintiffs by the Insurance agents.

Plaintiffs had not been added to the policy. On demand by Plaintiffs to explain

why they had not been added as additional insured, Defendants acknowledged

that they had not added Plaintiffs to the policy and have never done so.

(19)      Plaintiffs demanded on various occasions that Defendants reimburse them

for monies owed for purchase of replaced and repaired equipment, as previously

agreed upon, providing an option of either all cash or free rent for the amount due

of $45,000.00.  Defendants denied those requests, instead after originally

promising to pay demanded that Plaintiff leave, losing their $85,000.00 cash

investment and loss of all their installed equipment, decorations and furniture

items.

At the time rumors were circulating throughout the Gulf Shores area that

Defendant Lunceford had negotiated a sale of the property despite Plaintiff's

leasehold interest.  To add credibility to these rumors, Defendant Lunceford sent

two separate "house movers" to measure the restaurant building for the purposes

of moving it to another location.  Defendant Lunceford accompanied one of the

"house movers".  Plaintiffs reminded Defendant Lunceford of their leasehold

interest and demanded reimbursement of monies owed or, in lieu of payment, free rent.

(20)     Instead of honoring the leasehold interest, Defendants, and specifically Defendant Lunceford, began an intimidation program against Plaintiffs in an attempt to remove them from the property. Such acts included:

(a) Despite encouraging Plaintiffs to remodel the upstairs unit of the building into a two bedroom apartment Defendant Lunceford placed a formal complaint against Plaintiffs with the City Building and Zoning departments to have Plaintiffs evicted;

(b) Defendant Lunceford refused to pay Defendant's final utility bill prior to Plaintiff's occupancy resulting in $10,000.00 additional cost to Plaintiffs;

(c) Defendant Lunceford contacted the local ABC Board and fraudulently stated "he had cancelled Plaintiff's lease". The result was ABC's refusal to reissue plaintiff's Liquor License based upon "a clouded lease". The result was loss of thousands of dollars of revenue and unhappy customers.

(d) Defendant came onto the restaurant property and on various occasions threatened Plaintiff and Plaintiff's employees. The last threat was made

13

directly to Plaintiff's husband, in front of the restaurant's Assistant Manager, and

Plaintiff Morrell just several days prior to the fire.  At that time Plaintiff's husband

was accosted by Defendant Lunceford, acting in a belligerent and raving manner,

again wrongfully accusing Plaintiffs of being in arrears with rental payments.  In

turn, Plaintiff Morrell's husband demanded that Lunceford pay reimbursement of

over $50,000.00 promised to them for equipment purchases and extraordinary

repairs.  Plaintiff's husband ,unable to properly communicate with Defendant

Lunceford, and fearing physical harm stated that he would see Lunceford and Kelly

in court and "let a Judge decide".  Defendant Lunceford pointed his finger at Plaintiff

Morrell's husband and shouted: " **I can assure you we will not be going to court".**

three days later the restaurant was destroyed by an arson fire.  While Plaintiffs were

lucky to escape the fire all of their furniture, decorations, personal clothes and

belongings were destroyed and there pet dog killed.  Plaintiffs were left without

clothes or shoes to go to the store.

(21)   Prior to this filing, Defendant Lunceford, facing a possible 47 year sentence

pleaded guilty to arson.  Judy Kelly, clearly a coconspirator, was never charged as a

criminal since she became a prosecution witness against Defendant Lunceford.

## COUNT ONE-TORTUOUS INTERFERENCE
## PURSUANT TO 28 USC Section 1961

It is said tortuous interference tort liability may be imposed on a Defendant

who intentionally and improperly interferes with a business of another causing financial

harm.  Defendants, each and all, concocted a malicious and fraudulent scheme as dictate

by their actions, motivated by greed, that ended with an outrageous action causing both

financial ruin and possible loss of their lives.

The law of interference is thus one part of a larger body of tort law aimed at protection of relationships, both economic and personal.  Protection of relational interests has not been limited to protection from falsehood, however, liability may be imposed in the case of interference with both personal and economic relations if it means the interference is tortuous in itself.

It may be sufficient that a defendant has acted intentionally in that he has caused harm in doing so, and that he has acted in pursuit of some purpose considered improper. Although this "improper" interference was once described as "malicious" it is now clear that no actual spite is required at all.  No specific conduct is proscribed and which liability turns on the purpose for notion that the purposes must be considered improper in some undefined way.

The case of Lumley v. Gye,1853, 2 El. & Bl. 216, 118 Eng. Rep. 749,  is still the "bell-ringer" case for liability in these types of cases.  It has long been clear, however, that "malice" in the sense that ill-will or spite is not required for intentional interference.   In Felton v. Sol Manufacturing, 1969, 24 N.Y. 2nd 610 a Prima Facie case of intentional interference puts the burden of proof on the Defendant to justify his actions.

This case chronicles greed and deceit of Defendants, and the devastating impact on Plaintiffs, their employees and their business. The Defendants, each and all of them, working together developed and carried out a program of fraud and deceit to entice Plaintiffs into occupying their failed restaurant, (a) obtain Plaintiff's funds to be converted to their own use, (b) induced them to repair, renovate and redecorate by providing them with false, fraudulent revenue figures and (c) concealment of the true condition of the building and equipment. It was the Defendant's belief that Plaintiff would fail as had several previous operators, including Defendants. In the meantime, Plaintiff's money would provide the necessary funding for Defendants to pay their mortgage.

Defendants had, unbeknownst to Plaintiffs, actively engaged in negotiating a sale of the property prior to executing a lease with Plaintiffs. The Defendant's problem was that they did not have adequate financing to pay the mortgage on the property until an actual contract to sell was executed. Therefore, they fraudulently induced Plaintiffs to execute a lease and provide needed funding to Defendants.

Defendant's ill-conceived and fraudulent scheme, fraught with misrepresentations and lies, would have succeeded except Plaintiffs, through sheer hard work, long hours

16

and determination. began developing a successful year-around business.   Within two months, during the "slow part of the year", Plaintiff achieved gross revenues of $17,000-$20,000.00 per week and was requesting that promised reimbursements be honored , which would have refreshed their invested capital.

Defendants could not complete their anticipated sale of the property unless Plaintiffs voluntarily left or were removed from the building. Plaintiffs made it clear that they were not going to voluntarily void the lease, therefore, Defendants had no other option but to force Plaintiffs out of their lease to satisfy their greed and deceit.

To accomplish their goal, Defendants initiated a malicious program to interfere with Plaintiff's business by instituting the following tortuous acts:

(a) Fraudulently induced Plaintiffs to purchase new equipment or repair existing equipment with unfulfilled promises of reimbursement;

(b) Maliciously and fraudulently voiding utility deposit agreements and failing to pay for their last utility bill that resulted in Plaintiffs having to pay an additional $10,000.00 to the utility companies;

(c) Filing complaints with the Building and Zoning Departments of the City of Gulf Shores;

(d) fraudulently informing "his friends" at the ABC Alcohol Board that "our lease was cancelled" allowing them to refuse to renew Plaintiff's liquor license based upon a "clouded lease";

(e) Fraudulently filing an unlawful retainer against Plaintiffs when, in fact, he owed Plaintiffs over four (4) times the rent arrearage in promised reimbursements;

(f) Fraudulently spreading gossip that "the property was sold and the restaurant was closing to the local community that was heard by Plaintiff's employees causing them to begin looking for other jobs; and,

(g) Sending continuous correspondence threatening Plaintiffs with false allegations of monies owed while denying payment for all promised reimbursements;

(h) Verbally and physically threatening Plaintiff and their employees including threats of Malicious threats of closing the business.

There is absolutely no question that Defendants did maliciously conceive a plan to Interfere with Plaintiff's business to further their own greed resulting in a final act of Arson destroying Plaintiff's business and lives.

Plaintiffs, therefore respectfully request that this Court find in favor of Plaintiffs and against Defendants, each and all of them as damages that the Court deems fit.

### COUNT TWO-FRAUD AND MISREPRESENTATION PURSUANT TO 18 U.S.C.

(1)     Defendants, each and all, but specifically, Defendant Lunceford, despite his full knowledge provided Plaintiffs, initially, with grossly false previous revenue figures, the condition of the building/ equipment and existing building code violations. Once true facts were discovered he continually lied to Plaintiffs promising reimbursement or Replacement, which never occurred.

(2)     The promises and fraudulent information given by Defendants must be deemed statements of intention and "statements of fact" relied on by Plaintiffs before, during and after the execution of the lease. (Col.L. Rev. 14611461 1945)

(3)     It was the intention of Defendants to purposely and fraudulently misrepresent and defraud Plaintiffs by providing this misinformation.  The promises made were implied that Defendants would carry them out and must be recognized as a proper basis for reliance and deceit or for restitution of other equitable relief. (Feldman v. Witmark 1926, 254 Mass. 480, 150 N.E. 329; Kaufman v. Bobo & Wood 1950 99 Cal. App. 2d 322,221 P.2d 750.

(4)     Defendants made material representations and false statements to Plaintiffs concerning the availability and working condition of certain operating equipment and the true condition of the physical building including not revealing that there were many outstanding violations existing against the building.  In addition Defendants falsely informed Plaintiffs that all utility bills had been previously paid placing the obligation on Plaintiffs.

(5)     Defendants falsely provided Plaintiffs with an Exhibit "A" list of all equipment and fixtures and later on discovery of missing items agreed to replace but failed to do so causing over $45,000.00 extra expense to Plaintiffs, who replaced or repaired.

(6)     Defendants made false, misleading and grossly inflated statements to Plaintiffs

regarding the revenue figures generated by Defendants and other previous operators of the restaurant.  Defendant Lunceford stated that "I made plenty of money when I ran the restaurant; we grossed $4, 000, 000, 00. during that year. Plaintiffs relied on these figures in doing their profit and loss projections in accepting required lease payments.

(7)     Plaintiffs toured the restaurant while it was empty and non-operational in the company of Defendant Lunceford <u>without the benefit of utilities</u>.  At that time Defendant Lunceford promised that all equipment would be in operating condition.   After the restaurant was leased to a third party (Mr. Tran) and then vacated, Plaintiffs again toured the facility with Defendant Lunceford.  At that time <u>the utilities were on</u> but 70% of the promised equipment was either missing or inoperable.  Plaintiffs complained but was informed by Defendant Lunceford **"do not worry, the equipment was either broken or stolen by the previous tenant, Mr. Tran and you will receive all new equipment to replace it since I already filed charges and an insurance claim.**  I am going to get a large check in a week or two".

(8)     Based upon this assurance by Defendant Lunceford Plaintiffs decided to

proceed with the lease and advanced $22,000.00 to Defendants, which was the amount Defendants claimed they needed to cure their mortgage arrearages. It was discovered later that the funds were never used to correct the mortgage deficiencies, but diverted to other uses. As of November 8, 2007, Defendants were approximately $43,000.00 (4 payments) in arrears to Vision Bank, the first lien holder.

(9)    Defendants accepted $1,000.00 for insurance as a portion of the original $22,000.00 payment from Plaintiffs, agreeing to add Plaintiffs as "additional insured" to cover their furniture, fixtures and equipment for $250,000.00 with full knowledge that Plaintiffs were installing over $300,000.00 in antiques and furniture. Defendants purposely failed to add Plaintiffs to the existing policy. Plaintiffs discovered this malicious and fraudulent act by Defendants on or about August 15, 2007 and all requests to correct this error were ignored by Defendants.

(10)   Before, during and after the execution of a leasehold interest with Plaintiffs Defendants secretly and with deceit continued to actively negotiate a sale of the property to a third party that desired the property without a tenant or

building on the land in clear violation of Plaintiff's leasehold interest.

(11)    Defendants were so positive that Plaintiffs would fail in their endeavor to create a viable restaurant business at the location that they believed they could void the lease; keep Plaintiff's advanced funds without fulfilling all promises and repayments as agreed.  When Plaintiff's business began prospering, generating $17,000.00 to $20,000.00 per week during "the slow season" they began a malicious and vicious intimidation campaign to force Plaintiffs from the lease.

(12)    When Plaintiffs continued to prosper through long-hours, hard work and food preparation and service expertise it became apparent that Defendant's intimidation campaign would not detour Plaintiffs from continuing their business, Defendant Lunceford began filing fraudulent complaints against Plaintiffs to various agencies and threatening Plaintiffs and their employees. Finally, in an attempt to discourage Plaintiffs Defendant Lunceford accompanied two separate "house-movers" to the leased property with the intent "of moving the building to a new location at Highway 59 and Highway 20." Removal of the Plaintiffs and the building would highly increase the

22

desirability of the property to the third parties interested because it was directly adjacent

to a proposed main arterial street that opened up hundreds of acres in the rear of the

restaurant property that was already planned for development.  The building and any

tenant was a liability to these proposed buyers.

Later, on November 8, 2007, one day prior to Vision Banks intention to begin foreclosure

on the first building mortgage and three days after Defendant's "Guarantee we will not go

to court" threat Defendant's got their wish to remove tenant's from the building by

burning it down without regard for Plaintiff Morrell, her husband , their pet and all of

their possessions.

Defendant's, at this time owed Plaintiffs $63,000.00 in promised reimbursements ( less

October rent from Plaintiffs); and after the fire Defendant's loss increased to

over $400,000.00 including cash investment, equipment, decorations furniture and

clothes, all personal items including eyeglasses, bank cash, family pet and artwork.

Defendants only defense, prior to pleading guilty to arson was to point at Plaintiff

Morrell's husband, and his 1982 conviction falsely painted as "the bad guy" to place

blame on someone besides themselves.  In  fact, based on false information provided the

media and their recklessness in printing such stories without verification Plaintiff's

husband, legally known as Nick Cascario since 1982, was not an owner, nor was he a

signer on any legal documents or checking accounts, and acted only as the General

Manager.  Plaintiff Morrell, was never known as Cathy Cascario during this venture,

despite the press's continued statements and always used her legal name of Judy Morrell

in signing documents, checks of any kind including payroll checks., city or ABC licenses,

The one premise learned in that 1982 conviction was prosecutors always "follow the money", and in this instant case all of the money and motive pointed directly to Defendants.

Having fully expected Plaintiffs to fail, Defendants were at a quandary as Plaintiffs (a) survived the "slow period" while hiring, firing and training personnel to finally obtain a qualified staff at the correct labor cost, (b) were training a new, younger Manager who would replace Plaintiff Morrell's husband after hiring and firing others less qualified and (c)developed a qualified and motivated kitchen staff.

Most importantly, the restaurant was thriving and developing a fine reputation; one that normally takes years not months to achieve.  Plaintiff Morrell and her husband spent 24 hours a day at the restaurant to ensure this success. To emphasize this the restaurant was chosen to:

(1) Provide the entrée at the Chamber of Commerce sponsored largest function of the year for the City of Gulf Shores; (2)  became the "room service " facility providing all room service food "to the Marriott Courtyard Hotel in Gulf Shores; (3) contracted with Casino Bus Tours to provide dinner tickets to all bus riders going to Mississippi Casinos during the "season" and (4) contracted with the largest Real Estate office locally to provide  meals to  anyone that looked at property with their agents.  They would give two tickets to prospective customers, each worth $20.00.  Plaintiffs would receive full reimbursement  payment monthly.

With these lucrative revenue streams and anticipated "season/ snowbird" revenues Plaintiffs fully expected to gross $2,000, 000.00 the first year in business.

Instead, the Plaintiffs were never given the opportunity because they were burned out by the greedy and malicious Defendants. In addition, Plaintiffs did not only suffer complete financial ruin; unable to re-establish themselves financially, but had to suffer from the disgrace brought by Defendants fraudulent efforts to distract guilt from themselves by announcing Plaintiff Morrell's husband; conviction In 1982. One that he fully paid his debt to society. Plaintiffs were only trying to re-establish themselves in a community of their choice and it was becoming a reality by the progress and acceptance of their business and the new and wonderful friends made during that short period. Friends that Plaintiffs miss but are too ashamed to contact because of the negative media coverage

This was the result of Defendants conceived plan to ruin Plaintiff's business and lastly an attempt at murdering them by burning down the restaurant, knowing they were Inside. THEREFORE, Plaintiff respectfully request that this Honorable Court find in favor of Plaintiffs and against Defendants, a charge of fraud and Deceit with penalties as requested in the Pray For Relief section of this filing.

## COUNT THREE ARSON AND ATTEMPTED MURDER PURSENT TO 18 U.S.C. Sections 81 AND 918

(1) On November 8, 2007, Plaintiff's leased restaurant, complete with all of their worldly possessions, including clothes, personal possessions, artwork, furniture, equipment , family pet, available cash ($12,000"bank") family albums, etc., were destroyed by an arson fire. Arson is considered a tort action.

(2) In the instant case Defendants, alone or with unknown accomplices purposely Ignited a fire with intent to destroy the building without any regard to Plaintiff's

inside the building.  This act must be classified as Arson III, or Aggravated Arson as the fire was intentionally set knowing that it would do serious damage to the building and that the Plaintiffs were sleeping in the upper level of the building.

(3)    Attempted Murder is committed when a Defendant has specific intent to kill. In addition, Defendant must have (a) calculated planning, (b) selection of weapon, and (c) made threats.  Each and every ground required for Attempted Murder exists against Defendant Lunceford who was (1)  fully aware that Plaintiff Morrell, her husband and pet dog were temporarily living in the upper level of the building (2) disabled the fire sprinkler system to ensure that the building would be engulfed .
**He has since pleaded guilty to the arson in a plea bargain that will extremely lessen the term of his incarceration, after spending almost a year in jail.**

(4)    Defendant Kelly, while not charged with any criminal counts because she chose to act as a prosecution witness against Defendant Lunceford, was a co-conspirator in the planned attempt to unlawfully remove Plaintiffs from the restaurant building.  A next door neighbor has given a statement that she heard Defendant Lunceford's truck leave his driveway at 3:00 AM the morning of the fire.  It is impossible to believe the Defendant Kelly was not aware of what Lunceford's evil intentions were that early morning.  She must be held equally accountable.

(5)    Plaintiffs were standing in the way of the Defendant's opportunity to save the restaurant property from foreclosure and to repay promised reimbursements to Plaintiffs.

(6)     After many communications between parties, and various malicious attempts by Defendants to remove Plaintiffs from the property and requests by Plaintiffs to receive reimbursement of monies owed to them Defendants filed an unlawful Detainer action against Plaintiffs.  Plaintiffs countered by filing an answer and counter sued requesting the over $50,000.00 in promised reimbursements now owed to them.  The court hearing date was set for November 14, 2007.

(7)     On Monday, November 5, 2007, Defendant Lunceford appeared on the front porch of the restaurant just prior to noon and asked to see Plaintiff Morrell's husband.  He was angry, loud and combative and  falsely claimed Plaintiffs owed him $83,000.00.  The was the first time this figured was ever mentioned.  Plaintiff's husband asked about the approximately $54,000.00 that was owed to Plaintiffs for promises made to reimburse.  Defendant's answer was "it wasn't in writing, was it?"  Frustrated and in fear of physical danger by the now screaming Lunceford Plaintiff Morrell's husband stated: "I can't talk with you we will just bring our records to court and let a judge decide."  Defendant Lunceford pointed his finger and with Plaintiff Morrell and the restaurant manager listening yelled: **"I can guarantee you that we won't be going to court"** and walked away.

(8)     At this time Plaintiffs were informed that an attorney representing Vision Bank, the first lien-holder on the property was beginning foreclosure on November 9, 2007, a day after the fire and the same week of Defendant Lunceford's last threat.

## **PRAYER FOR RELIEF**

**NOW COMES PLAINTIFFS,** respectfully requesting that this honorable Court

or Trier-in -Fact issue the following Order:

(1) This Complaint is lawfully and properly filed with this Court according to law;

(2) Plaintiffs be awarded $1,000,000.00 in General Damages, as well as Special,

Nominal, Consequential, Punitive and any other damages provided by law against each

and all Defendants;

(3) Plaintiffs be awarded any and all reasonable attorney fees  and court costs that

have been made necessary by Defendants actions; and,

(4) Such other and further relief as this Court deems just and fair.


Submitted this _____10TH_____ day of November, 2009.


Respectfully submitted by:




_Judy Morrell_
Judy Morrell for all named Plaintiffs

_Bertha Zamora_
BERTHA ZAMORA